UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ARMANDO LERMA-TREVINO,

    Petitioner,

v.                                                  Case No. 8:08-cv-1492-T-17TBM

SECRETARY DEPARTMENT OF CORRECTIONS,

    Respondent.
_____/

## **ORDER**

This cause is before the Court on Armando Lerma-Trevino's 28 U.S.C. § 2254 petition for writ of habeas corpus. The petition attacks Lerma-Trevino's conviction for attempted first degree murder resulting from charges filed in the Twelfth Judicial Circuit in Manatee County, Florida, in state circuit case number 03-CF-1041.

A review of the record demonstrates that, for the following reasons, the petition must be **denied.**

### PROCEDURAL HISTORY

On April 21, 2003, the State Attorney filed an Information charging Lerma-Trevino with one count of attempted first degree murder with a firearm. (Exh 10: Vol. 1: R 6-7).[1] The case proceeded to trial before the Honorable Jack R. Schoonover, Circuit Judge, on June

---

[1] Respondent filed the four-volume record on direct appeal as Respondent's Exhibit 10.

1, 2004. Lerma-Trevino was represented by Assistant Public Defenders Steven A. Schaefer and Jennifer Sanchez. The jury found Lerma-Trevino guilty as charged. (Exh 10: Vol. 1: R 58-59). On July 9, 2004, the court sentenced Lerma-Trevino to twenty-five (25) years imprisonment. (Exh 10: Vol. 1: R 66-71).

Lerma-Trevino pursued a direct appeal. His appointed counsel, Assistant Public Defender Robert E. Rosen, filed an initial brief (Exhibit 1), raising one issue: THE EVIDENCE WAS INSUFFICIENT TO SUPPORT A FINDING OF PREMEDITATION FOR FIRST-DEGREE MURDER. The State filed an answer brief. (Exhibit 2). On August 19, 2005, in Case No. 2D04-3385, the Second District Court of Appeal filed an unwritten per curiam opinion affirming Lerma-Trevino's conviction and sentence. (Exhibit 3). *Lerma-Trevino v. State*, 910 So. 2d 268 (Fla. 2d DCA 2005)[table]. The mandate was issued on September 13, 2005. (Exhibit 4).

On March 7, 2006, Lerma-Trevino, pro se, filed a Motion for Postconviction Relief pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure. (Exhibit 5). He raised five grounds for relief, which the postconviction court treated as six separate claims: (1) trial counsel was ineffective for failing to present a defense; (2) trial counsel was ineffective for conceding Lerma-Trevino's guilt; (3) trial counsel was ineffective for failing to investigate and call an important defense witness; (4) trial counsel was ineffective for failing to object to improper comments by the prosecutor; (5) trial counsel was ineffective for failing to ensure a correct guidelines scoresheet; and (6) trial counsel was ineffective for striking a potential juror due to race, ethnicity, and national origin. On May 29, 2007, the postconviction court issued an order summarily denying all claims. (Exhibit 6).

Lerma-Trevino appealed the adverse ruling. (Exhibit 7). No briefs were filed by either party. On April 2, 2008, in Case No. 2D07-3593, the appellate court filed an unwritten per curiam opinion affirming the lower court's denial of postconviction relief. (Exhibit 8). *Lerma-Trevino v. State,* 979 So. 2d 229 (Fla. 2d DCA 2008. The mandate was issued on April 24, 2008. (Exhibit 9).

Lerma-Trevino submitted the present § 2254 petition to prison officials for mailing on August 1, 2008. (Doc. 1). The petition presents the following two grounds for relief:

Ground One

DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL CONCEDED TO DEFENDANT'S GUILT AND CALLED HIM A DRUNK DURING TRIAL.

Ground Two

DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO OBJECT TO THE IMPROPER COMMENTS MADE BY THE PROSECUTOR REGARDING DEFENDANT'S SILENCE.

The above claims were properly raised in the Rule 3.850 motion for postconviction relief and are therefore exhausted for federal habeas corpus purposes. Moreover, the petition appears to be timely filed pursuant to 28 U.S.C. § 2244(d).

STANDARDS OF REVIEW

Under 28 U.S.C. § 2254(d) and (e) as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), this court's review of the state court's factual findings must be highly deferential. Such findings are presumed to be correct unless rebutted by clear and convincing evidence. Similarly, the state courts' resolutions of issues of law-including constitutional issues-must be accepted unless they are found to be "contrary

to" clearly established precedent of the Supreme Court of the United States or involve an "unreasonable application" of such precedent. *Williams v. Taylor*, 529 U.S. 362 (2000). Indeed, it is not enough that the federal courts believe that the state court was wrong; it must be demonstrated that the state court decision was "objectively unreasonable." Id. *Breedlove v. Moore*, 279 F.3d 952 (11th Cir. 2002).

Ineffective Assistance of Counsel Standard

To prevail on a claim of ineffective assistance of trial or appellate counsel, a Petitioner must meet the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland*'s two-part test requires a Petitioner to demonstrate that counsel's performance was deficient and "there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* However, if a claim fails to satisfy the prejudice component, the court need not make a ruling on the performance component.

**DISCUSSION**

GROUND ONE

Lerma-Trevino alleges his trial counsel was ineffective for conceding his guilt and calling him a drunk during trial. This claim is without merit, because Lerma-Trevino cannot show deficient performance on his counsel's part, nor prejudice resulting from counsel's actions. The state court's order denying the motion for postconviction relief sets out the following findings of fact and conclusions of law:

> Next, the Defendant alleges that he was denied effective assistance of counsel because his trial counsel conceded his guilt during the course of trial. In support of this argument, the Defendant claims that defense counsel "sealed his client's coffin when he called the Defendant a drunk" and relieved

the state of its burden by telling the jury they should "choose one of the crimes that the Defendant committed" and "find [the Defendant] guilty of manslaughter.

As the Florida Supreme Court has previously noted:

Sometimes concession of guilt to some of the prosecutor's claims is good trial strategy and within defense counsel's discretion in order to gain credibility and acceptance of the jury.

When faced with the duty of attempting to avoid the consequences of overwhelming evidence of the commission of an atrocious crime, such as a deliberate, considered killing without the remotest legal justification or excuse, it is commonly considered a good trial strategy for a defense counsel to make some halfway concessions to the truth in order to give the appearance of reasonableness and candor and to thereby gain credibility and jury acceptance of some more important position.

*Atwater v. State*, 788 So. 2d 223, 230 (Fla.2001).

Again, the court finds the Defendant's allegations misconstrue actual statements on the record in the present case. Indeed, in his closing statement, defense counsel discussed the elements necessary for each offense and suggested that manslaughter, rather than a more severe crime, "fit" the circumstances. (See Tr. at 289-293). More specifically, the defense counsel stated, "I have a little problem trying to argue to you that this was ordinary caution, walking around in the middle of the night with a loaded gun as drunk as he was. Maybe it doesn't quite fit under excusable homicide ... but I suggest to you it fits under the manslaughter." (Tr. at 289)

In the instant action, the Defendant was charged with attempted first-degree murder with a firearm. The defense counsel's rendition of the facts and alternative theory of manslaughter were consistent with the statements against interest made by the Defendant to his employer/friend, Robert Macias, who testified accordingly. (Tr. at 166-81) As such, it was a viable alternative theory to the State's position. Furthermore, the Defendant's "post-conviction claim offers no real alternative theory for the defense, except to question trial counsel's decision[s]." *Gamble v. State*, 877 So. 2d 706, 714 (Fla. 2004). Based on the overwhelming evidence against him (i.e. including but not limited to the victim's testimony, other witness testimony, and the Defendant's own statements against interest), the record supports that a strategic decision was likely made by defense counsel in accordance with the above-referenced *Atwater* reasoning. It is well established that "strategic decisions do not

- 5 -

constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." *Occhicone v. State*, 768 So. 2d 137, 1048 (Fla. 2000). Applying a strong presumption that counsel's conduct fell within the range of reasonable professional assistance, the Court finds that even if defense counsel's statements constituted a concession of guilt, it fell within the bounds of trial strategy under *Atwater* reasoning. Thus, the court finds that this claim is without merit.

(Exh 6: Order Denying Motion for Postconviction Relief at pp. 4-6).

In order to show a violation of the Sixth Amendment right to counsel, Lerma-Trevino must satisfy the two-pronged inquiry of *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Bell v. Cone*, 535 U.S. 685, 698, 122 S.Ct. 1843, 1852, 152 L.Ed.2d 914 (2002)(courts should apply *Strickland* to claims that counsel failed to satisfy constitutional requirements at specific points). First, Lerma-Trevino must demonstrate that his attorney's performance was deficient, meaning that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Second, Lerma-Trevino must prove prejudice, in that he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id., 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

The postconviction court's conclusion, under the facts of this case, that defense counsel had engaged in a reasonable trial strategy in an attempt to gain acceptance by the jury and avoid a conviction for the charged crime of attempted first degree murder was objectively reasonable, and comports with United States Supreme Court precedent. A trial counsel's strategic or tactical choices in a criminal case, after a thorough investigation of

the law and facts, "are virtually unchallengeable in an ineffective assistance of counsel claim . . ." *Strickland*, 466 U.S. at 689-690. Moreover, the fact that a chosen strategy or defense was ultimately unsuccessful does not mean that counsel's performance was ineffective. *See Zamora v. Dugger*, 834 F.2d 956, 959 (11th Cir. 1987)(attorney's tactical decision to employ an insanity defense may not have been successful in retrospect, but *Strickland* allows trial counsel great latitude to conduct a defense). "The reasonableness of a counsel's performance is an objective inquiry." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000). For a petitioner to show deficient performance, he "must establish that no competent counsel would have taken the action that his counsel did take." *Id.*

In *Atwater v. Crosby*, 451 F.3d 799, 807-809 (11th Cir. 2006), the Eleventh Circuit faced a similar ineffective assistance of counsel claim where defense counsel in a death case had conceded in closing argument that the evidence might support the lesser offense of second-degree murder, but there was nothing to support the premeditation element for first-degree murder. The court quoted the Florida Supreme Court's opinion in *Atwater v. State* (*Atwater II*), 788 So. 2d 223, 231 (Fla. 2001), noting the Florida Supreme Court found that:

> [a]t no point during the opening statement or during any of the testimony did defense counsel concede Atwater's guilt. During the first part of defense counsel's closing argument, defense counsel argued that the State failed to prove robbery and therefore could not prove felony murder. Defense counsel stated in the first part of closing arguments that he would address premeditation after the State's closing argument. The State argued in closing argument that it had proven robbery and premeditation, and discussed the evidence presented which included: Atwater had threatened to kill Smith a week before; Smith was afraid of Atwater and hid from him; on the night of the murder Atwater signed in on the clerk's log at Smith's apartment building;

- 7 -

> Atwater exited approximately twenty minutes later and told the desk clerk that nobody answered the door; Atwater had blood on his shoes and pants that was not from Atwater himself; and Atwater told his aunt and cousin that he killed Smith and enjoyed it. In response, then, and in rebuttal closing argument, defense counsel addressed premeditation and argued that the evidence might support the lesser offense of second degree murder, but there was nothing to support premeditation. In light of the overwhelming evidence of guilt presented by the State, which we acknowledged in our opinion on the direct appeal, defense counsel's argument was reasonable.... [D]efense counsel did subject the State's case to meaningful testing, and only after the State's case was presented and fully argued did defense counsel resort to making some concession -- a trial strategy intended to save Atwater's life. Under the circumstances, this strategy was reasonable.
>
> *Id.* at 231-232

*Atwater v. Crosby*, 451 F.3d at 807. The Eleventh Circuit affirmed the state court's denial of the ineffective assistance of counsel claim, finding that the circumstances of the case, the court could not conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. 451 F.3d at 809.

In this case, the state court's rejection of Lerma-Trevino's ineffective assistance of counsel claim is likewise objectively reasonable. Here also, defense counsel did subject the State's case to meaningful testing. Trial counsel cross-examined all seven of the State's witnesses (Exh 10: Vol. 3: T 117-203), objected to certain testimony by Mr. Macias as a discovery violation and moved for mistrial (Exh 10: Vol. 3: T 174-175), successfully kept out of trial Lerma-Trevino's taped statement to the police (Exh 10: Vol. 4: T 241-242), and moved for a judgment of acquittal on the charge of first-degree murder. (Exh 10: Vol. 4: T 251). Accordingly, Lerma-Trevino failed to carry his burden to show that trial counsel's performance was deficient or that he suffered any prejudice, and Ground One does not warrant habeas relief.

GROUND TWO

Lerma-Trevino asserts trial counsel was ineffective for failing to object to the prosecutor's alleged improper comments during closing argument. Specifically, Lerma-Trevino takes issue with the prosecutor's remark that the evidence was "unrebutted" that Lerma-Trevino shot his wife. Lerma- Trevino claims that such remark constituted a violation of a defendant's right to remain silent. Again, this claim was properly denied without a hearing, because the record conclusively shows the prosecutor's comment could not reasonably be construed as a reference to Lerma-Trevino's silence. The order denying the motion for postconviction relief states in pertinent part as follows:

> As a fourth ground for relief, the Defendant alleges that he was denied effective assistance of counsel because his trial counsel failed to object to improper comments made by the Prosecutor regarding the Defendant's silence. In support of this allegation, the Defendant contends that defense counsel should have objected when the Prosecutor "improperly argued that the fact that Armando shot his wife in the head was "unrebutted" and instructed the jury that "the only thing they need to decide was what [the Defendant] intended to do." (Tr. at 277) The Defendant further alleges that "this indirect commentary" by the Prosecutor "shifted the State's burden of proof" and "constituted a violation of [the Defendant's] Fifth Amendment privilege not to testify."
>
> With an exception for harmless error, "a comment on the defendant's exercise of his right to remain silent is reversible error." *State v. DeGuilio*, 491 So. 2d 1129, 1136-37 (Fla. 1986). This Court must first determine, however, whether the Prosecutor's statements even qualify as statements "regarding the Defendant's silence." Florida has "adopted a very liberal rule for determining whether a comment constitutes a comment on silence: any comment which is 'fairly susceptible' of being interpreted as a comment on silence will be treated as such." *Id.* at 1135. After reviewing the record in the present case and applying the very liberal "fairly susceptible" test, the Court is not convinced that the Prosecutor's statements are equivalent to comments regarding the Defendant's silence. Moreover, the Florida Supreme Court has permitted comment by prosecutors on the "unrebutted" nature of the testimony as not being a comment on defendant's right to remain silent. *See, e.g., White v. State,* 377 So. 2d 1149 (Fla. 1979); *State v. Jones*, 204 So. 2d 515 (Fla.

1967). On the basis of the foregoing, the Court finds that this claim is also without merit because the Prosecutor's comments did not constitute comments regarding the Defendant's silence.

(Exh 6: Order Denying Motion for Postconviction Relief at pp. 7- 8).

The state court's conclusion that defense counsel did not perform deficiently is reasonable. However, even if the prosecutor's comment was improper, Lerma-Trevino cannot establish prejudice. With respect to prejudice, he asserts only that these comments resulted in the State encouraging the jury to infer his guilt from his silence. In light of the evidence presented to the jury, such assertion is insufficient to show areasonable probability that, but for counsel's error, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694 (To prove prejudice, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."). The facts adduced at trial were summarized by the State in its answer brief on direct appeal as follows:

> Appellant and the victim, Maria Viola Lerma, had been married for twenty-three years. (Vol. III, T 127). In the early morning hours of April 1, 2003, Appellant shot his wife in the back of the head. (Vol. III, T 136). At the time of the shooting Appellant and his wife were experiencing marital problems. (Vol. III, T 129). At Ms. Lerma's request, Appellant had not been living in the family home for about one month. (Vol. III, T 129). Also living in the family home with Ms. Lerma were her daughter Maria, her son, Armando, and Armando's wife, Anacelis. (Vol. III, T 128, 154).
>
> At approximately 5:10 a.m. on April 1, 2003, Ms. Lerma was getting ready for work. (Vol. III, T 130). Appellant opened a sliding glass door located on the side of the house which led to the dining room. (Vol. III, T 130, 132). The dining room and the kitchen of the house are right next to each other and are only separated by a countertop. (Vol. III, T 154). Ms. Lerma was in the kitchen making coffee and toast. (Vol. III, T 173). Appellant stood in the doorway and attempted to engage his wife in a conversation, but she simply told him to leave. (Vol. III, T 130, 140). Appellant shut the door and left. (Vol.

III, T 141). Ms. Lerma then took a shower to get ready for work. (Vol. III, T 151).

About twenty minutes later, at approximately 5:30 a.m., Ms. Lerma walked out the back door of the home to get her tennis shoes. (Vol. III, T 130). Ms. Lerma keeps her tennis shoes next to the washing machine which is located outside the back door on a wooden deck. (Vol. III, T 130, 132-134). When she walked outside the door to get her tennis shoes she saw Appellant standing in the backyard wearing a red jacket that belonged to her. (Vol. III, T 135, 147). When she saw Appellant, Ms. Lerma said to him something like, "again, it's you." (Vol. III, T 147- 148). Without saying a word, Appellant pulled a gun from the jacket pocket, aimed it at her, and then fired it. (Vol. III, T 136, 147, 150). The bullet entered the back right side of Ms. Lerma's head or upper neck just below her jaw and exited through the inside of her mouth, injuring her jaw and teeth. (Vol. III, T 137 and Vol. IV, T 247-250). However, at first, Ms. Lerma did not realize she had been shot. (Vol. III, T 136).

After appellant shot his wife, she ran back into the house through the back door, through the hallway, and to the dining room. (Vol. III, T 137, 148). While she was running, she was yelling for her son to stop his father. (Vol. III, T 136, 148). Appellant followed his wife into the house and to the dining room. (Vol. III, T 137, 148). When Ms. Lerma saw the Appellant inside the house, she saw him put the gun to his head and pull the trigger. (Vol. III, T 149). At about this same time, Ms. Lerma first noticed she was bleeding and realized she had been shot. (Vol. III, T 149).

Also at this time, Ms. Lerma's son, Armando, came out of his bedroom and ran to the dining room where his mother and Appellant were located. (Vol. III, T 150, 154). Armando saw Appellant put the gun to his head and pull the trigger about three times, but the gun did not fire. (Vol. III, T 159). Armando also saw that his mother had been shot and observed blood coming out of her mouth. (Vol. III, T 154-155). Armando yelled to Appellant to stop what he was doing and positioned himself between his mother and Appellant. (Vol. III, T 159, 161). Appellant did not say anything to either Armando or Ms. Lerma but merely walked out of the house, on his own, through the back door. (Vol. III, T 155-156, 159, 161). After Appellant left the house, Armando drove his mother to Manatee Memorial Hospital. (Vol. III, T 156).

Robert Macias, Appellant's boss at the time of the shooting, testified he received a telephone call from Appellant at about 6:10 a.m. on April 1, 2003. (Vol. III, T 166-167). Appellant told Mr. Macias that it was an emergency and he needed to talk to him and wanted to meet with him at Froggie's bar in Ellenton. (Vol. III, T 167). Mr. Macias arrived at Froggie's at about 6:20 a.m., just as they were opening the doors, which were usually opened about 6:30

a.m. (Vol. III, T 168). Appellant said it was really important for the two of them to talk, but he wanted Mr. Macias to have a drink with him first. (Vol. III, T 169). After Appellant and Mr. Macias had been at the bar for about an hour, another of Mr. Macias' employees, Johnny Garcia, arrived. (Vol. III, T 168). Mr. Macias and Appellant talked and drank for about two hours but Appellant still had not mentioned what had happened. (Vol. III, T 169). During the entire time they were talking and drinking, Mr. Macias testified that Appellant's demeanor was "pretty calm." (Vol. III, T 169). Appellant then said he wanted to talk with Mr. Macias outside the bar. (Vol. III, T 169).

Once the two men were outside the bar, Appellant said, "I think I just killed my wife." (Vol. III, T 169). When Mr. Macias asked Appellant how he did it, Appellant stated: "I shot my wife in the head." (Vol. III, T 170). Knowing Appellant did not carry a gun, Mr. Macias asked him how he shot her? (Vol. III, T 172). Appellant stated that he had bought a gun for $30.00. (Vol. III, T 172). Mr. Macias further testified that Appellant told him he had gone to the house to try to compromise with his wife, to try to work things out. (Vol. III, T 173). Appellant stated his wife was making coffee and he asked her if he could get a cup of coffee from her but she just turned around and "pretty much told him to go F himself." (Vol. III, T 173). Appellant then told Mr. Macias his wife turned around again and started to put some bread in the toaster and that was when he pretty much "snapped" and shot her. (Vol. III, T 173). When asked by Mr. Macias what he planned to do next, Appellant told him he "had three options to think about what he was going to do. He said either he was going to shoot himself, leave the States, or he wanted me to stay there and drink with him until the police arrived." (Vol. III, T 179).

Appellant showed Mr. Macias the gun he used to shoot his wife, which he had placed in the center console of his truck. (Vol. III, T 176). Johnny Garcia used a white t-shirt to take the gun from Appellant's truck and then he put it in his pocket. (Vol. III, T 168, 176). Later, while Appellant was using the bathroom, Mr. Macias and Mr. Garcia inspected the gun and saw it had two bullets in it; one was a shell, and one was a bullet. (Vol. III, T 176). Mr. Macias testified the police arrived at Froggie's about three hours after he and Appellant first arrived there, and they placed Appellant under arrest. (Vol. III, T 177). The police also recovered the gun from Mr. Garcia. (Vol. III, T 178).

Detective Curtis Johnson of the Bradenton Police Department testified he took possession of the gun at the scene. (Vol. III, T 188, 190). The gun was a revolver and contained two rounds. (Vol. III, T 190). One round had been fired, and the other was a misfired round as evidenced by the indentation made in the round's primer by the firing pin of the weapon. (Vol. III, T 191, 193-195). Det. Johnson testified the gun's trigger would have been pulled at least twice. (Vol. III, T 196).

(Exh 2: Answer Brief of Appellee at pp. 4-8).

Given the testimony of the victim and her son and the admissions made by Lerma-Trevino to his employer, it cannot be said that the result of the proceeding would have been different had trial counsel's objected to the prosecutor's comment. Accordingly, the state court's rejection of this claim is objectively reasonable and this Court will deny Ground Two pursuant to the deference standard of 28 U.S.C. § 2254(d) and (e). Ground Two does not warrant habeas relief.

Accordingly, the Court orders:

That Petitioner Lerma-Trevino's petition is denied. The Clerk is directed to enter judgment against Petitioner and to close this case.

## CERTIFICATE OF APPEALABILITY AND
## LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

IT IS FURTHER ORDERED that petitioner is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue ⋯ only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at § 2253(c)(2). To make such a showing, petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further, ' " *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v.*

*Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Petitioner has not made the requisite showing in these circumstances.

Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal in forma pauperis.

ORDERED at Tampa, Florida, on February 9, 2010.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Counsel of Record
Armando Lerma-Trevino